2020 IL App (1st) 180855

Nos. 1-18-0855 & 1-18-1677 (cons.)

Second Division
December 8, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE CITY OF CHICAGO, a Municipal Corporation, Through Its Department of Finance, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | No. 16 L 50158 |
| | ) | |
| v. | ) ) | Honorable James M. McGing, |
| WILLIAM SOMMERFELD, as Responsible Officer of Mid-City Parking, Inc., and THE CITY OF CHICAGO DEPARTMENT OF ADMINISTRATIVE HEARINGS, | ) ) ) ) ) | Judge, presiding. |
| | ) | |
| Defendants | ) | |
| | ) | |
| (William Sommerfeld, Defendant-Appellant). | ) | |
| _____ | )_____ | |
| | ) | |
| MID-CITY PARKING, INC., | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CH 04400 |
| | ) | |
| THE CITY OF CHICAGO, THE DEPARTMENT OF FINANCE, and THE DEPARTMENT OF ADMINISTRATIVE HEARINGS, | ) ) ) ) | |
| | ) | Honorable |
| | ) | Daniel J. Kubasiak, |

Defendants-Appellants.          )       Judge, presiding.

---

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1       These consolidated actions involve the tax liability of two parking lots owned by Mid-City Parking, Inc. (Mid-City), for which William Sommerfeld is the President and Responsible Officer (RO). The City of Chicago (City) audited Mid-City and determined that it had failed to collect and remit parking tax on funds it received from valet parking services, restaurants, and other entities that utilized space in the two lots. The City assessed a total of $461,307.88 in unpaid taxes, interest, and a late penalty against Mid-City. The City also issued a separate tax assessment in the amount of $462,328.05 against Sommerfeld as Mid-City's RO, for which Sommerfeld claimed he did not receive proper notice.

¶ 2       Mid-City filed a protest, claiming that it was not a parking lot " '[o]perator' " within the meaning of the Parking Lot and Garage Operations Tax Ordinance (Parking Tax Ordinance) (Chicago Municipal Code § 4-236-010 (amended Nov. 21, 2017)) and, therefore, was not required to collect and remit taxes on funds it received for the use of its lots. The administrative law officer (ALO) and the director of Department of Administrative Hearings (DOAH) affirmed the tax assessment. Mid-City sought administrative review, and the circuit court ultimately reversed the decision of the ALO. The City now appeals from that decision in No. 1-18-1677.

¶ 3       The City also sought a separate determination that the assessment issued to Sommerfeld, in his capacity as Mid-City's RO, was "due and owning." The ALO found that Sommerfeld was not afforded proper notice of his assessment before it became final and thus dismissed the

City's action. The circuit court reversed the ALO's decision, finding that its ruling that Sommerfeld was not afforded proper notice was "clearly erroneous." Sommerfeld now appeals from that decision in No. 1-18-0855.

¶ 4     For the following reasons, we reverse the circuit court and affirm the ALO's decision in regard to the City's appeal, No. 1-18-1677, but affirm the circuit court and reverse the ALO's decision in regard to Sommerfeld's appeal, No. 1-18-0855.

¶ 5                                    I. BACKGROUND

¶ 6     Mid-City manages eight parking lots in Chicago, including the two involved in this appeal, located at 3440 North Broadway Street (Broadway lot) and 30 West Ohio Street (Ohio lot). On January 11, 2011, the City sent a letter to Sommerfeld, informing him that it would conduct an audit of Mid-City as to certain taxes, including applicable parking taxes, employers' expense taxes, and use taxes for nontitled personal property for the period of July 1, 2006, through June 30, 2010.[1] The letter requested that Mid-City make available its books and records for the audit. The letter was sent to Sommerfeld at 325 West Huron Street, Suite 713, Chicago, Illinois, 60610, which was Mid-City's business address. Sommerfeld signed a certified mail green card, indicating that he received the letter on January 20, 2011.

¶ 7     The City requested that Mid-City submit a taxpayer information form, which Sommerfeld completed on behalf of Mid-City. On the form, Sommerfeld included both Mid-City's business address as well as his home address. This form was kept in the audit file.

¶ 8     The City also provided an audit method election form. That form stated that Sommerfeld and LaVern Coleman, an auditor with the City's Department of Revenue, had discussed

---

[1]The audit as to the employers' expense tax and use tax for nontitled personal property concluded on March 9, 2011. The City determined that there was no tax liability for these two taxes.

"alternative audit methodologies" and agreed to use the Test Period Method, (also known as the Judgmental Sampling Method). The Test Period Method consists of a "detailed review of a mutually agreed sample period within the period under audit." The selected sample period, as provided by the form, included three days in June 2010: June 22, 2010, June 24, 2010, and June 28, 2010. The form further described the Test Period Method in detail, providing that:

> "Based on the test periods selected, the auditor will request and review documentation to support the accuracy and completeness of receipts reported to the [City]. The auditor will compute taxable parkers and compare it to reported taxable parkers for the test periods. If any discrepancy exists, the auditor will compute an error percentage by dividing computed taxable parkers by reported taxable parkers. This error percentage will be extrapolated to reported taxable parkers not reviewed in detail within the audit period. The auditor will then apply the appropriate tax rate to audited taxable parkers to compute tax due for the audit period."

¶ 9      The form was signed by Coleman and included a signature line for Mid-City's representative, which was left unsigned. A handwritten note on the bottom of the form explained that Mid-City "refused to sign." Coleman's supervisor, nevertheless, gave permission to perform the audit as described on the form.

¶ 10                    A. Background Relevant to the City's Appeal

¶ 11                              1. The Audit

¶ 12      The audit commenced on February 24, 2011. During her examination of Mid-City's books and records, Coleman noticed a "Summary Sheet" detailing "rent" for the Broadway and Ohio lots. Samuel Sorkin, Mid-City's accountant, confirmed that Mid-City had "rented out" the Broadway and the Ohio lots to valet parking services, restaurants, and other business entities.

Pursuant to oral agreements, these rentals were on a month-to-month basis. Coleman concluded that the funds Mid-City received in exchange for the use of these lots were taxable.

¶ 13     On October 31, 2011, the City issued a Notice of Tax Determination and Assessment (Assessment Notice), informing Mid-City that it owed a total of $461,307.88 in unpaid taxes. This amount included $310,301.27 in unpaid parking taxes, as well as interest in the amount of $107,204.72 and a late payment penalty of $43,801,89. On December 1, 2011, Sorkin, on behalf of Mid-City, filed a timely "Protest and Petition for Hearing." The protest did not challenge the amount of the assessments or the methodology. Rather, the protest challenged the assessment on the ground that Mid-City was not a parking lot "operator," as defined by the Parking Tax Ordinance, and instead acted as a "landlord" with respect to the rent it received.

¶ 14     2. The Hearing

¶ 15     The matter was referred to the DOAH, which held a hearing on January 6, 2016.[2] The City moved to enter into evidence a certified copy of the comptroller's audit file. No objections were raised, and the audit file, containing the assessment, was admitted. At the hearing, Coleman and Sommerfeld testified to the following.

¶ 16     Coleman testified that she had a Bachelor of Science degree in business administration and majored in accounting. Although she was not a certified public accountant (CPA) and did not have an accounting certificate or license, she had been previously employed as a revenue agent for the United States Internal Revenue Service and as a tax auditor for a CPA firm. She also had been employed by the City as an auditor for nine years. Coleman testified that her job

---

[2]Pretrial proceedings commenced before the ALO in February 2012. During the early period of those proceedings, Sorkin appeared on behalf of Mid-City. In July 2014, prior to the close of discovery, attorneys James Novy and Steven Kienzle entered their appearances on behalf of Mid-City, with Patrick Chinnery serving as counsel throughout the course of the administrative hearing.

responsibilities with the City included "conduct[ing] audits to ensure that businesses are in compliance with the municipal tax ordinance." She noted that these audits were conducted "under the direct supervision of the [audit] supervisor." Coleman conducted "[w]ell over 100" audits, of which approximately 9 involved the City's parking tax.

¶ 17    During Mid-City's audit, Coleman visited its parking lots for a test count. According to Coleman, the test count revealed a discrepancy between the number of cars she observed and the number of cars reported by Mid-City on its tax returns. Coleman testified that the test count did not "factor *** in the assessment that [she] ultimately issued in the matter" because she accepted Mid-City's explanation that the discrepancy was attributable to the count being performed during a certain time and she "could not make a distinction if there were monthly parkers" and "[they] couldn't account for ins and out." Despite accepting Mid-City's explanation as to the discrepancies she observed, Coleman was still able to determine tax liability based on her examination of Mid-City's financial records or summary sheets, which revealed "rent" income as to the Broadway and Ohio lots. To audit Mid-City for the "rent" disclosed on the summary sheet, Coleman used the Test Period Method for the month of June 2010. Coleman described the Test Period Method as "we just look at a certain period, look at the books and records for that period" and "[i]f we find an assessment or an error for that period, we just extrapolate it over the entire audit period."

¶ 18    Coleman testified that she informed Mid-City of the use of the Test Period Method. Mid-City did not consent to the methodology, nor did it request an alternative method. Although Mid-City produced "daily sheets and monthly summary sheets" for the June 2010 test period, it did not produce business records that would have allowed Coleman to "conduct an actual audit of the entire audit period." When Mid-City argued that the "rent" was not parking income,

Coleman asked for "written documentation" to support the assertion. She did not receive any documents. Coleman's supervisor reviewed the parking tax assessment before Coleman issued it to Mid-City.

¶ 19      On cross-examination, Coleman confirmed that in conducting audits, the City uses either the Statistical Sample Method or the Test Period Method. The auditor has the discretion to choose which methodology to apply. Using the Test Period Method, Coleman looked at the single month of June 2010, which was the same month as when she conducted the test count. Coleman agreed that "according to the Department of Finance, the most important factor with the [Test Period Method] is to select a sample period which is representative of the entire audit period." Coleman did not "choose June 2010 because [she] thought it was going to be the most representative month of the audit period." In fact, she did not know whether it was representative because she did not examine Mid-City's "records for any of the other 47 months in the audit period." Coleman stated that she "could've picked any month" for her calculation if she "selected another period as a test period." Coleman acknowledged that the "City does not have a policy of making calculations based on 1 out of 48 months" and as such, she could have taken a sample that covered more months.

¶ 20      Coleman agreed that the first step of "her audit list" involved comparing the numbers of cars in the lots to the count reported in Mid-City's tax filings. After reviewing a document prepared by Mid-City, she agreed that Mid-City overreported the Ohio lot by 2 cars and the Broadway lot by 43 cars. Based solely on the comparison between her car count and Mid-City's financial documents, Coleman agreed that it appeared that Mid-City did not owe any taxes. However, Coleman also confirmed that the City's assessment had "nothing to do with

[this] car count"; instead, it "came 100 percent from what [Mid-City] records in its books as rental income from Ohio and Broadway lots."

¶ 21        Mid-City's summary sheet showed that Mid-City received $22,200.02 in "rental income" for the Broadway lot and $9,424.77 in "rental income" for the Ohio lot during June 2010. By dividing these amounts by the rate Mid-City charged its "monthly parkers," Coleman found that 99 cars were underreported for the Broadway lot and 51 cars were underreported for the Ohio lot. Her calculations showed an "error percentage" of 151.95, which she applied to all 48 months of the audit period in which Mid-City had monthly parkers at the Broadway and Ohio lots. Coleman stated that she did not need the test count to do this calculation. For her calculation, she assumed that "every single dollar Mid-City marked as rental income was actually paid by a monthly parker for [the Broadway and Ohio] lots."

¶ 22        On redirect examination, Coleman testified that Mid-City did not ask her to use any other methodology or test months for calculating its liability. Mid-City never "complain[ed] that the error percentage that she calculated was incorrect because other test months would've shown that the error percentage was less." Coleman reiterated that she was not given "any documentation that would've enabled [her] to make that calculation in order to make that determination [herself]." Mid-City also did not tell her "the money that was characterized in their documents as rent was for anything other than" parking. Coleman did not receive any "sort of invoice, any other document that would've shown or allocated any of the amounts that [Mid-City] had for rent to any particular payment from any particular business." Nor did Mid-City provide any "reports on who or how many cars" were parked that would have enabled Coleman to do a more detailed calculation.

¶ 23    Sommerfeld testified that he served as president of Mid-City. During the period of 2006 to 2010, Mid-City managed eight parking lots, including the Broadway and Ohio lots. Both parking lots obtained revenue from three sources: daily parkers, monthly parkers, and rental income. The rental income derived from "different users of the premises," including a valet company, a restaurant, and a bank. Renters were permitted to use the rented space for purposes other than parking cars "[a]s long as everything was within the law." No written contracts existed for the rental income. The rentals were on a "month-to-month basis[,] but not necessarily on a month-after-month" basis. Some rental periods were shorter than a month. With respect to using the space for parking, Sommerfeld stated that the rental income was not connected to the number of cars parked. Rather, a flat rate was paid, regardless of how many cars were parked. Mid-City did not keep track of the number of cars parked in the rental area and never asked the renting entities for the number of cars parked. Sommerfeld testified that because some of the rental income came from hotels and valet services, the cars were probably parked there. After the space was rented, Mid-City had nothing to do with the operation of that rental space for the period of that rent term. Sommerfeld testified that he made the decision to not pay any parking taxes on what he called "rent." As to the present case, Sommerfeld confirmed that Mid-City was not challenging the amount of the parking tax assessed against it but rather claiming that it was not subject to the parking tax at all.

¶ 24                                3. ALO's Decision

¶ 25    On February 3, 2016, the ALO issued a decision finding that the tax assessment was correctly issued. In doing so, the ALO considered Coleman's testimony, which was found to be "credible and reliable." The ALO looked at Coleman's detailed testimony of the steps she took to arrive at the assessment and her testimony that the audit rested on a mathematical

calculation based on the amount of income reported by Mid-City as "rent." The ALO rejected Mid-City's argument that it was not a parking lot "operator" when it rented space. The ALO found that "there was no question under the definitions contained in [s]ection 4-236-020 that [Mid-City] is a parking lot 'operator' since [Mid-City] admittedly received consideration for the parking of motor vehicles by the valet services and banks who rented this space." The ALO further found that Mid-City failed to sustain its burden of proving that the assessment was inaccurate because its "evidence [was] devoid of any detailed books or records from which the amount of parking as opposed to other uses, if any, [could] be determined." Mid-City subsequently filed a petition seeking review by the Director of the DOAH. The Director denied the petition and affirmed the ALO's decision.

¶ 26                                4. Circuit Court's Decision

¶ 27        On March 29, 2016, Mid-City sought administrative review in the circuit court. On September 26, 2016, the circuit court issued its decision, reversing the ALO's decision. The court held that the City failed to establish its *prima facie* case because its audit methodology was improper. The court found that the City's audit of Mid-City differed from the process outlined in the City's Tax Audit Process rules. According to the court, a "judgmental sampling audit, by its very definition and the [City's] published procedures, requires a sampling of months or periods and not just a single month. It also requires, most importantly, that a sample be 'representative of the entire audit period.' " The City's audit of Mid-City, on the other hand, comprised only of a single, "high" volume test month, and Coleman's testimony further provided that she did not choose June 2010 because it was the most "representative" month of the audit period. Therefore, the court found that the City's audit was "arbitrary, unreasonable, and unsupported by the record." The court also noted that although the record was clear that

Mid-City failed to produce sufficient evidence to refute the City's audit, that burden only arises after the City presents an assessment that is *prima facie* correct, which it failed to do.

¶ 28    The City moved to reconsider, and the court vacated its initial decision and remanded to the ALO for further evidence. Specifically, the court remanded the case with directions "(1) to determine whether the presumption that the [a]ssessment is *prima facie* correct was rebutted by Plaintiff and/or testimony of the [City's] witness, and (2) if necessary, to take additional evidence." The City again moved the court to amend its decision on reconsideration. On July 5, 2018, the circuit court entered an order that denied the motion to amend, vacated its decision on reconsideration, and reinstated its September 26, 2016, decision. This appeal followed.

¶ 29                    B. Background Relevant to Sommerfeld's Appeal

¶ 30                    1. RO Notice and Second Assessment Letter

¶ 31    The City sent, via express mail, a separate notice of tax determination and assessment, dated November 10, 2011, to Sommerfeld (RO notice)[3] in his capacity as the RO of Mid-City. The tracking system for the United States Postal Service (USPS) showed that the RO notice was delivered on November 17, 2011. The RO notice was sent to Mid-City's business address. Sommerfeld did not contest that this address was his office and/or registered agent office.

¶ 32    The RO notice, like the assessment notice issued to Mid-City, assessed $310,301.27 in unpaid parking taxes and a late payment penalty of $43,801.89. The RO notice also included interest in the amount of $108,224.89, for a total of $462,328.05 in unpaid taxes. The notice

---

[3]The City issued the RO notice pursuant to section 3-4-270 of the Uniform Revenue Procedures Ordinances, which provides that "[a]ny officer or employee of any taxpayer or tax collector who controls, supervises, or is responsible *** for paying or remitting any tax imposed by any tax ordinance, and who wilfully fails to file any applicable return or wilfully fails to pay or remit any applicable tax, interest or penalty shall be personally liable for all such amounts due and owing." Chicago Municipal Code § 3-4-270(A) (amended Dec. 15, 1999).

stated that unless Sommerfeld "file[d] a protest and petition for hearing within 35 days of receipt of [the] notice, it will automatically become a final assessment without further notice." Sommerfeld did not file a protest or respond within the 35-day timeframe.

¶ 33        On February 2, 2012, the City sent a second assessment letter via certified mail to Sommerfeld at the Mid-City business address. This letter notified Sommerfeld that the assessment became final due to his failure to protest it. The letter also informed Sommerfeld of his right to obtain a hearing on the final assessment if, within 30 days, he paid the "tax stated in the assessment together with the related interest due to date" and filed a written protest.

¶ 34                                    2. *Sommerfeld I*

¶ 35        Sommerfeld received the final letter and filed a "Protest and Petition for Hearing" with the City on February 10, 2012, but did not pay the tax and interest that was due. This initiated the matter of *Sommerfeld v. Chicago Department of Finance*, No. 12 TX 0019 (*Sommerfeld I*) (Ill. Dep't of Admin. Hearing Mun. Div., Tax Section Nov. 27, 2013). The City moved to strike the protest based on Sommerfeld's failure to pay the tax and interest as required by section 3-4-330(C) of the Uniform Revenue Procedures Ordinances (URPO) (Chicago Municipal Code § 3-4-330(C) (amended Nov. 14, 2018)). In response, Sommerfeld argued that the City should not be able to proceed against him personally until there was a judgment that Mid-City failed to pay the assessment.

¶ 36        After a hearing on November 27, 2013, the ALO issued a decision, finding that it did not have jurisdiction to hear the protest because Sommerfeld failed to pay the tax that was due. No judicial review of that decision was sought.

¶ 37                                    3. The Present Case

¶ 38    On January 14, 2014, the City sent Sommerfeld a letter, notifying him that it would be seeking a final determination of his tax liability. On February 12, 2014, Sommerfeld filed a "Request for a Section 3-4-335 Hearing" form. This form stated that the only permissible defenses to the City's action are payment of the assessment, misidentification of the proper party, and improper notice of the assessment. Sommerfeld claimed that he did not receive proper notice of the assessment in November 2011 but rather received his first notice in February 2012. On July 15, 2014, the City filed a motion, arguing that Sommerfeld was barred from raising that issue under the doctrines of *res judicata* and collateral estoppel. The City argued that the ALO's decision in *Sommerfeld I*, granting the City's motion to strike the protest and Sommerfeld's failure to seek judicial review of that decision, constituted a final decision between the parties. On February 4, 2015, the ALO entered an order, finding that *Sommerfeld I* did not bar Sommerfeld from asserting improper notice.

¶ 39    On January 6, 2016, the ALO held an evidentiary hearing, at which Coleman and Sommerfeld testified.

¶ 40    Coleman testified that she prepared and issued an assessment to Sommerfeld as the RO for Mid-City. She mailed a letter regarding the assessment (*i.e.*, RO notice) on November 10, 2011, via express mail. Coleman stated that she used express mail because "it was the end of the year *** and we wanted to ensure that it was received before we left for vacation." The "track and confirm" receipt from USPS indicated that the RO notice was delivered on November 17, 2011. Coleman testified that a taxpayer has 35 days from the date of receipt of the initial assessment to file a protest. Because Sommerfeld did not file a protest within 35 days, she mailed a second assessment letter or a "30-day notice" via certified mail on February 2, 2012. Coleman received confirmation that the letter was delivered. According to Coleman,

there was no policy within the Department of Finance requiring assessments to be sent by certified mail but about 90% of them are sent via certified mail.

¶ 41        On cross-examination, Coleman stated that she received a completed taxpayer information form from Mid-City, which listed a business address of 325 West Huron Street in Chicago and Sommerfeld as the primary contact person. The form also included Sommerfeld's home address as 4364 Grand Avenue, Western Springs, Illinois. This form remained in the City's audit file. Coleman acknowledged that the RO notice was addressed to William "Sommerfield" as opposed to "Sommerfeld" and that she did not send it to Sommerfeld's home address, though she had it in her audit file. She did not select the "proof of delivery" option for the RO notice, which was sent by express mail. As such, she did not "have anything in the audit file that shows a signature receipt" for the RO notice. Coleman further acknowledged that she sent all other letters in this case by certified mail rather than express mail. Each of these letters included a green card that confirmed delivery. Like the RO notice, Coleman stated that the second assessment letter was directed to misspelled Sommerfeld's name as "Sommerfield."

¶ 42        Sommerfeld testified that Mid-City was audited in 2011, and as part of the audit, he completed the taxpayer information form. He first learned that the City was seeking to hold him personally liable for the Mid-City assessment by a letter he received at Mid-City's business address sometime around February 2, 2012. Sommerfeld acknowledged that the letter indicated that the City had previously attempted to give him notice of the personal assessment. However, he was not aware of this, as he never received the RO notice. After receiving the second assessment letter, Sommerfeld contacted Sorkin, who then filed a protest. Sommerfeld stated that the only reason he did not file a protest sooner was because he did not receive the

RO notice in November. He also testified that none of the other letters addressed to him spelled his name correctly.

¶ 43    On cross-examination, Sommerfeld stated that he occasionally received personal mail at the Mid-City business address. He, his son, and an individual by the name of Juanita Estrada were the only people who handled Mid-City's mail. To his knowledge, neither his son nor Estrada ever withheld mail. No one at Mid-City withheld mail from him. He admitted that he was not confused by the misspelling of his last name on the second assessment letter and "understood [the letter] was directed to [him]." Sommerfeld acknowledged that there was nothing in his protest stating that he did not receive the RO notice. Sommerfeld also did not raise this issue in his brief in opposition to the City's motion to strike in *Sommerfeld I.*

¶ 44    On redirect examination, Sommerfeld testified that as of February 2012, he was not represented by an attorney. Sommerfeld also stated that he was not familiar with section 3-4-340 of the URPO (Chicago Municipal Code § 3-4-340 (amended Nov. 16, 2011)).

¶ 45    On January 27, 2016, the ALO granted Sommerfeld's protest and dismissed the City's petition with prejudice. In doing so, the ALO first reiterated its previous finding that the doctrines of *res judicata* and collateral estoppel did not bar Sommerfeld's claim of improper notice. The ALO then found that Sommerfeld was not afforded proper notice because the RO notice was not sent to his home address, although the City had his home information on file. The ALO noted that the City also failed to notify Sorkin of this assessment, despite knowing that "Mid-City had filed a power of attorney naming [him]" as a representative and some of the other letters sent to Mid-City were directed to Sorkin. The ALO further found that because the RO assessment involved a "significant amount of money" and all of the other letters were sent via certified mail, the City's decision to "send [RO notice] by express mail rather than by

certified mail return receipt *** [due to the] time of the year and the possibility of vacations" was "perplexing and, thus, lack[ed] credibility." Taking into account "[Sommerfeld's] testimony that he did not receive the RO [a]ssessment *** and the [City's] sole reliance on the post office website's notation regarding its express mail delivery," the ALO found that the City failed to meet its burden of proof that the RO notice was served on Sommerfeld on November 17, 2011.

¶ 46        On March 2, 2016, the City sought administrative review in the circuit court, asserting that the doctrines of *res judicata* and collateral estoppel applied and that the ALO's conclusion that Sommerfeld was not properly served was incorrect as a matter of law and, alternatively, clearly erroneous. Sommerfeld filed a response. On August 31, 2017, the circuit court reversed the decision of the ALO and remanded for entry of the tax assessment. In doing so, the court affirmed the ALO's decision that the doctrines of *res judicata* and collateral estoppel did not apply, but found that the ALO's finding was clearly erroneous because the City complied with the service requirements set forth by section 3-4-040 (Chicago Municipal Code § 3-4-040 (amended Nov. 16, 2011)) and section 3-4-330(C) (Chicago Municipal Code § 3-4-330(C) (amended Nov. 14, 2018)) of the URPO. The court also took judicial notice that "several years ago, the 60610 zip code in [the] river north area of Chicago was changed by the USPS and a new zip code of 60654 was added because of the growing development." Sommerfeld filed a motion to reconsider, which the court denied. This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48                               A. Standard of Review

¶ 49        "When an appeal is taken to the appellate court following entry of judgment by the circuit court on administrative review, it is the decision of the administrative agency, not the judgment

of the circuit court, which is under consideration." *Chak Fai Hau v. Department of Revenue*, 2019 IL App (1st) 172588, ¶ 32. An administrative agency's factual findings are presumed to be *prima facie* true and correct, and we may only set them aside if they are against the manifest weight of the evidence. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). We apply a *de novo* standard of review to pure questions of law. *Id.* However, where "the case involves an examination of the legal effect of a given set of facts, it involves a mixed question of law and fact, and the administrative agency's decision will be affirmed unless clearly erroneous." *Id.* The agency's decision is clearly erroneous when the reviewing court is definitely and firmly convinced that a mistake has been committed. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel¸* 216 Ill. 2d 569, 577-78 (2005).

¶ 50        Further, when the propriety of a circuit court's decision rests on an issue of statutory construction, our review is *de novo. Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). The rules of statutory construction apply to the interpretation of municipal ordinances. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 7 (2009). The "fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 460 (2006). The most reliable indicator of that intent is the "language of the statute, which is to be given its plain and ordinary meaning." *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). In determining the plain meaning of statutory terms, a court must "consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it." *Id.* When the statutory language is clear and unambiguous, a court may not depart from the plain language by reading into the statute " 'exceptions, limitations or conditions that the legislature did not express.' " *Evanston Insurance Co. v. Riseborough*, 2014

IL 114271, ¶ 15 (quoting *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990)). The language of the statute must be "applied as written, without resort to extrinsic aids of statutory construction." *Solon*, 236 Ill. 2d at 440. However, a court may consider extrinsic aids of construction if a statute can reasonably be understood in two or more different ways. *Id.*

¶ 51                                             B. The City's Appeal

¶ 52        On appeal, the City argues that the circuit court improperly considered its audit methodology where Mid-City only challenged the assessment on the ground that it was not an "operator" as defined in the Parking Tax Ordinances. The City further contends that the circuit court erred in reversing the ALO's decision where the tax assessment was *prima facie* correct and Mid-City did not meet its burden of proving that the assessment was incorrect with "books, records, and other documentary evidence." Mid-City, on the other hand, appears to advance three arguments: (1) the ALO improperly focused on Mid-City's role as the "operator" or tax collector and not on the Parking Tax Ordinance's imposition of tax on the "recipient," (2) the City's assessment was not "*prima facie*" correct as it was based on speculation rather than facts or competent evidence, and (3) Mid-City's right to due process was violated because the City failed to follow its Tax Audit Process Rules and Procedures (TAP Rules and Procedures) and did not allow Mid-City to select the audit method.

¶ 53        Prior to addressing the merits of this case, we briefly address the City's argument that the circuit court "wrongly injected concerns about the audit methodology into this case" and therefore, incorrectly entertained other bases for reversal aside from those set forth in Mid-City's protest. As previously discussed, we do not look to the judgment or reasoning employed by the circuit court. Rather, our review is limited to the decision of the hearing board or officer. Thus, we review the ALO's decision and the parties' arguments as they relate to that decision.

¶ 54                                    1. Parking Tax Ordinance

¶ 55        Mid-City, in its written protest, challenged the assessment on the single ground that it was

not a parking lot "operator" as defined by the Parking Tax Ordinance and instead acted as a

"landlord" with respect to the rent it received. As such, the sole issue before the ALO was

whether Mid-City was an " '[o]perator' " under the Parking Tax Ordinances (Chicago

Municipal Code § 4-236-010 (amended Nov. 21, 2017)) and whether there was sufficient

evidence to support that finding. See Chicago Municipal Code §3-4-340(A)(2) (amended Nov.

16, 2011) (providing that "[t]he administrative law officer *** shall not hear or decide any

claim not stated [in] the written protest, either as initially filed with the department or as

subsequently amended prior to the hearing"). On appeal, the City contends that the ALO

correctly found that Mid-City was a parking lot "operator" under the Parking Tax Ordinances

because it "received consideration for the parking of motor vehicles by the valet services and

banks who rented [the] space." Mid-City, on the other hand, appears to argue that the ALO's

decision was erroneous, as it misapplied the Parking Tax Ordinances.

¶ 56        The Parking Tax Ordinances impose a tax on the "privilege of parking a motor vehicle in

or upon any parking lot or garage in the City of Chicago." Chicago Municipal Code § 4-236-

020(a) (amended May 24, 2017). While the "ultimate incidence of and liability for payment of

the tax is on the person who seeks the privilege of occupying space in or upon the parking lot

or garage [*i.e.*, recipient]," the obligation to collect and remit the tax is on the parking lot or

garage operator. *Id*. § 4-236-020(b)-(f). Under the Parking Tax Ordinances, the operator "shall

secure the tax from the recipient at the time the price, charge or rent *** is collected." *Id.* § 4-

236-020(f). An " '[o]perator' " is defined as "any person who conducts the operation of a

parking lot or garage *** or who, directly or through an agreement or arrangement with another

party, collects the consideration for parking or storage of motor vehicles at such parking place."

Chicago Municipal Code § 4-236-010 (amended Nov. 21, 2017). " 'Person' " is broadly

defined as "any natural person, trustee, *** partnership, limited liability company, firm, club,

company, corporation, *** or any other entity." *Id.*

¶ 57     Here, Mid-City managed the Broadway and Ohio lots and entered into oral agreements

with various business entities regarding rental of its lots' space. The "rent" served as

consideration that entities paid for the privilege of occupying space in the Broadway and Ohio

lots. Although Sommerfeld testified that Mid-City was not involved with the operation of the

rental space for the period of the rent term, it is clear that Mid-City collected or received rental

income for the use of its lots for parking. For instance, Sommerfeld testified that the rental

income was derived from various entities that were permitted to utilize the rented space for

parking or other purposes. Sommerfeld also testified that because some of the rental income

came from hotels and valet services, the rented space was more likely used for parking. No

evidence was presented to show that the rental income was not from parking. As such, the

ALO did not err in finding that Mid-City was an "operator" as there was sufficient evidence to

show that some of the "rent" or "consideration" Mid-City received came from use of its lots

for parking.

¶ 58     Citing *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 424 (1973), Mid-City appears to argue

that it is not subject to the Parking Tax Ordinances because the ultimate liability for payment

of the tax is upon the person who seeks the privilege of occupying space in a parking lot and

not the operator. We agree that the ordinance provides that the "ultimate incidence and liability

of payment of the tax" is imposed on the recipient, not upon the party collecting the funds.

However, the ordinance also imposes an obligation upon the "operator" to collect and remit

such taxes. This means that the Parking Tax Ordinances impose on Mid-City any liability arising from its failure to remit taxes owed; therefore, Mid-City is subject to the ordinance. See Chicago Municipal Code § 3-4-280 (amended Nov. 13, 2007) (stating that "[a]ny tax required to be collected by any tax collector pursuant to any tax ordinance and any tax in fact collected by a tax collector shall be collected in trust for the city and shall constitute a debt owed by the tax collector to the city").

¶ 59 Mid-City further argues that the Parking Tax Ordinances do not apply because the ordinance requires that the tax be obtained directly from the recipient (*i.e.*, entities' customers or guests) at the time they park. We disagree. The ordinance requires the "operator" to collect the tax from the recipient of the parking privilege. This means that tax must be collected from the person or entity that pays for and receives "the privilege of occupying space in or upon the parking lot or garage." Chicago Municipal Code § 4-236-020(b) (amended May 24, 2017). Here, the recipients who occupied the rented spaces were the various business entities that paid rent to Mid-City for that privilege, not the entities' customers or guests. As such, the ordinance by its plain language, requires the tax be paid by the entities that pay "rent" and requires Mid-City to secure the tax from those entities at the time the rent is collected. See *id.* § 4-236-020(f).

¶ 60 2. The *Prima Facie* Case

¶ 61 The City argues that the tax assessment was *prima facie* correct and, consistent with the ALO's findings, that Mid-City did not meet its burden to prove that the assessment was incorrect with "books, records, and other documentary evidence." Mid-City contends that the "City's [a]ssessment for the funds was based upon pure speculation and because it was not supported by any facts, defeated the asserted '*prima facie*' correctness of the [a]ssessment." Although Mid-City's objection relates to the facts or evidence in the case, the City cites to the

Chicago Municipal Code to support its argument that it made a *prima facie* case. Thus, the parties' objections pose mixed questions of law and fact, which we review for clear error.

¶ 62    We find that the plain language of the Chicago Municipal Code clearly negates Mid-City's challenge to the City's assessment as incompetent evidence. Section 3-4-130 of the URPO states:

> "It shall be presumed that any tax, interest, penalty or nontax debt assessed by the comptroller is due and owing until the contrary is established. The person assessed has the burden of proving with documentary evidence, books and records that any tax, interest, penalty or nontax debt assessed by the comptroller is not due and owing." Chicago Municipal Code § 3-4-130 (amended Nov. 16, 2011).

¶ 63    With regard to hearings, section 3-4-340(H)(1) of the URPO states:

> "At any hearing held under this chapter, the tax determination and assessment and the assessment of any nontax debt shall be prima facie correct and the protesting party shall have the burden of proving with books, records and other documentary evidence that it is incorrect." Chicago Municipal Code § 3-4-340(H)(1) (amended Nov. 16, 2011).

¶ 64    The plain language of section 3-4-130 provides that the tax assessed by the comptroller is generally considered due and owing until it is rebutted with evidence. Similarly, for purposes of administrative hearings, section 3-4-340(H)(1) clearly states that the tax assessment is deemed to be *prima facie* correct and the protesting party bears the burden to then prove that the assessment is incorrect with evidence. We further note that even if the documentary requirement to rebut a *prima facie* case of tax liability was not derived from the Chicago Municipal Code or other statutory source, it has independent validity as a general evidentiary

requirement. See *PPG Industries, Inc. v. Department of Revenue*, 328 Ill. App. 3d 16 (2002); see also *Sprague v. Johnson*, 195 Ill. App. 3d 798, 804 (1990).

¶ 65        Here, the assessment was issued by the comptroller and admitted into evidence during the administrative hearing without any objections. As such, the assessment provided support to the City's claim that Mid-City owed taxes. Nevertheless, Mid-City contends that the *prima facie* "correctness" of the assessment was defeated, as it was based on speculation. For instance, Mid-City points to Coleman's testimony that she "assumed that every single dollar Mid-City marked as rental income was actually paid by a monthly parker." Mid-City further suggests that the City's methodology was flawed because June 2010 was not a representative sample. Additionally, Mid-City notes that it actually overreported or overpaid for more cars than Coleman observed during her test count. According to Mid-City, Coleman's testimony provides "clear evidence that there were no cars actually parked for which taxes were not paid." Further, "[n]o facts were adduced at the [h]earing to establish that the funds at issue were from anything other than rent from companies, not from parkers" and therefore, the assessment was solely based on speculation. Citing *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999), and *Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813 (1981), Mid-City makes the general assertion that speculation is no substitute for evidence, and an agency decision based upon speculation is not supported by substantial evidence. We disagree.

¶ 66        Although Coleman looked at dates within the single month of June 2010 and acknowledged that she could have used another test month, Coleman also testified that Mid-City did not object to this methodology and did not produce additional records that would have allowed her to "conduct an actual audit of the entire audit period." Instead, she received daily and monthly summary sheets for the sole month of June 2010. Because Mid-City did not object to the

sample size and Coleman was not tendered additional records for other months, we find that it was reasonable for Coleman to look at June 2010 to determine tax liability.

¶ 67    Additionally, Coleman testified that she was only informed that the rental income for the Broadway and Ohio lots "came from companies that rented sections of the parking lot." Sorkin confirmed that Mid-City had "rented out" the Broadway and Ohio lots to valet services, restaurants, and other business entities. Given that the lots were "rented" to valet parking services, Coleman could very well conclude that some of the rental income derived from the use of the lots for parking. She was not told that "the money that was characterized in [Mid-City's] documents as rent was for anything other than" parking. To the extent that Mid-City later argued that the "rent" was not parking income, Coleman asked for "written documentation" to support that assertion. Mid-City, however, failed to provide any documents. Absent documents showing otherwise, it was not unreasonable for Coleman to assume that the reported rental income was derived from parkers. Although we acknowledge Mid-City's argument that it overreported or overpaid for more cars than Coleman observed during her test count, we note that Coleman testified that the City's assessment had "nothing to do with [this] car count" and instead "came 100 percent from what [Mid-City] records in its books as rental income from Ohio and Broadway lots." This alternate methodology appears to be consistent with the City's procedures as outlined in the audit election form, which states that if any discrepancy exists, the auditor would be required to then "compute an error percentage," which Coleman did in this case.

¶ 68    Even assuming, *arguendo*, that the methodology was flawed or inconsistent with the City's general audit procedures, Mid-City forfeited this argument by failing to raise it in its written protest. Similarly, any challenges by Mid-City as to the amount of the assessment is also

forfeited where it was not raised in the protest. As we previously discussed, Mid-City, in its written protest, challenged the assessment on the single ground that it was not a parking lot "operator."

¶ 69      Having found that the City established its *prima facie* case, the burden of coming forward with "books, records, or other documentary evidence" to prove the assessment was incorrect shifted to Mid-City. The ALO found that Mid-City failed to rebut this assessment as its evidence was "devoid of any detailed books or records from which the amount of parking as opposed to other uses, if any, can be determined." Mid-City also does not dispute that it failed to present documentary evidence but, instead, points out that it "advised that the leases were [oral] agreements from the [entities] renting sections of the lots, not from parking automobiles." and therefore, the burden shifted to the City to present "competent evidence" to prove its case.

¶ 70      In *PPG Industries, Inc.*, the taxpayer argued that it did not owe reversionary sales under the Illinois Income Tax Act. *PPG Industries*, 328 Ill. App. 3d at 30. This court held that the taxpayer could not refute the Department of Revenue's case without some documentation to corroborate its witness's testimony that no sales had been made. *Id.* at 36. In doing so, this court found its prior decision in *Balla v. Department of Revenue*, 96 Ill. App. 3d 293, 296 (1981), to be instructive. The petitioner in *Balla* was a single parent who sought review of the Department of Revenue's decision disallowing income tax exemptions that she claimed for her three children. *Id.* at 294. The court held the petitioner's testimony that she was the sole source of her children's support insufficient to establish her entitlement to certain tax exemptions. *Id.* at 296. Absent records corroborating her statements, the court found that the petitioner failed to sustain her burden of proof. *Id.* The court reasoned that it was not "unreasonable to expect

- 25 -

[the petitioner] to do more than simply state that she supported the children." *Id.* Similarly, Mid-City's assertion that it had oral lease agreements is not enough to defeat the City's *prima facie* case, and we do not find it unreasonable to require that Mid-City refute the City's assessment through documentary evidence. Therefore, we find that the ALO did not err in finding that Mid-City needed to provide some sort of documents to defeat the City's case.

¶ 71 In sum, we find that the ALO's decision was not clearly erroneous because the City established its *prima facie* case by introducing into evidence the assessment showing Mid-City's liability. Thus, the burden shifted to Mid-City to rebut the assessment with documentary evidence, which it failed to produce.

¶ 72                                    3. Due Process

¶ 73 Having found that Mid-City was an "operator" within the meaning of the Parking Tax Ordinances and the City established a *prima facie* case of tax liability, we now address Mid-City's argument that the "City's imposition of the parking tax on rental income was a violation of its due process rights because the City failed to follow its TAP Rules and Procedures prior to and during the audit." Mid-City points out that "long before [Coleman] notified Mid-City on January 11, 2011 that it was the subject of an audit, Coleman had visited Mid-City's lots on June 22, 24, 28, 2010 to perform 'test counts.' " Coleman then chose the Test Period Method, only looking at June 2010, as that was when she performed her test count and not because it was the most representative month. Mid-City asserts that the most important factor when selecting a sample period under the Test Period Method is to select one that is representative of the entire audit period. Mid-City further argues that Coleman, in violation of the City's TAP Rules and Procedures, also failed to solicit its opinion on the selected audit approach or "any possible alternative" and failed to incorporate its concerns "into the approach or [provide]

- 26 -

reasons why they cannot." As such, the City's assessment against Mid-City, "without any input or choice into the method or specific audit period(s), denied Mid-City the ability to protect itself from this arbitrary action."

¶ 74    The City, on the other hand, argues that the comptroller did not promulgate the document as a rule or regulation but merely posted it as an "informal document" on the City's website. The City also contends that Mid-City's reliance on this document is procedurally barred, since Mid-City's due process claim was not previously raised and the URPO permits the ALO to only consider the grounds stated in the written protest. We agree.

¶ 75    Section 3-4-340(A)(2) of the URPO provides that the ALO "shall not hear or decide any claim not stated [in] the written protest." Chicago Municipal Code § 3-4-340(A)(2) (amended Nov. 16, 2011). Here, Mid-City's written protest made no mention that the methodology the City used in auditing was improper or differed from the methodology described in the "Tax Audit Process" document. This omission constitutes a waiver of the issue on administrative review. See *Smith v. Department of Professional Regulation*, 202 Ill. App. 3d 279, 287 (1990) (providing that the waiver rule "specifically requires first raising an issue before the administrative tribunal" and applies equally to issues pertaining to constitutional due process rights). Therefore, we find that Mid-City waived its due process argument.

¶ 76                    C. Sommerfeld's Appeal

¶ 77    We now turn to Sommerfeld's arguments on appeal. Sommerfeld argues that the "City's commencement of this action against [him] was premature" because the plain language of sections 3-4-270(A) and 3-4-270(B) of the URPO (see Chicago Municipal Code § 3-4-270 (amended Nov. 3, 2017)) "do not give the City authority to bring multiple actions." He contends that an action seeking to hold him personally liable could not be initiated until there

was a finding that Mid-City violated the Parking Tax Ordinances and failed to pay the "amount due and owing." Alternatively, Sommerfeld contends that the ALO's decision should be affirmed because he was not afforded proper notice of the assessment against him.

¶ 78                                                    1. Multiple Actions

¶ 79        As an initial matter, we address the City's argument that Sommerfeld was procedurally barred from asserting that section 3-4-270 of the URPO prohibited the City from issuing him a RO assessment, where a separate tax assessment against Mid-City was not fully litigated. The City contends that Sommerfeld cannot raise this issue now because the present action was initiated under section 3-4-335 of the URPO (see Chicago Municipal Code § 3-4-335 (amended Nov. 14, 2018)), which specifies only three defenses, and the "status of litigation on any other assessment" is not one of the enumerated defenses. We agree.

¶ 80        Here, Sommerfeld filed a request for a section 3-4-335 hearing after the City notified him that it would be seeking a final determination of his tax liability. Section 3-4-335 of the URPO is invoked when a "person fails to pay an assessment that has become final pursuant to [s]ection 3-4-330(C)." *Id*. § 3-4-335(A). Sommerfeld's assessment became final, pursuant to section 3-4-330(C) of the URPO, when he failed to file a written protest within the initial 35-day time period and failed to file a protest within the subsequent 30-day timeframe with payment of the assessed tax and interest. Chicago Municipal Code § 3-4-330(C) (amended Nov. 14, 2018). Unlike section 3-4-330, which places no limitations on the defenses that could be raised for protests filed within the 35-day and 30-day period, section 3-4-335 limits the defenses that could be raised for an assessment that has become final. Specifically, section 3-4-335(D) provides that "[t]he respondent's defenses shall be limited to whether and to what extent the final assessment has been paid, whether the respondent is in fact the assessee and whether the

respondent was afforded proper notice of the assessment before it became final." Chicago Municipal Code § 3-4-335(D) (amended Nov. 14, 2018). Section 3-4-335(D) further provides that a "respondent shall not be entitled to raise any defenses related to the respondent's liability for the unpaid tax which gave rise to the final assessment." *Id.* As such, any defenses raised by Sommerfeld pertaining to the Mid-City action or his liability for unpaid taxes is barred.

¶ 81    Aside from the procedural bar, we find that Sommerfeld's argument lacks merit. The plain language of sections 3-4-270(A) and 3-4-270(B) of the URPO belies Sommerfeld's argument that an action against him can only be commenced upon a finding that Mid-City violated the Parking Tax Ordinances and failed to make a payment. Section 3-4-270(A) of the URPO only provides that

> "[a]ny officer or employee of any taxpayer or tax collector who controls, supervises, or is responsible for filing tax returns or remittance returns or *** for paying or remitting any tax imposed by any tax ordinance, and who wilfully fails to file *** shall be personally liable for all such amounts due and owing." Chicago Municipal Code § 3-4-270(A) (amended Dec. 15, 1999).

Section 3-4-270(B) of the URPO, on the other hand, states that "[t]he personal liability of any person described in subsection A *** shall survive the dissolution of the taxpayer or tax collector" and that "[n]o notice of tax determination and assessment shall be issued to, and no collection action shall be commenced against, an officer or employee *** more than three years after the conclusion of all administrative and judicial proceedings relating to any assessment issued to the taxpayer or tax collector." *Id.* § 3-4-270(B). Read in conjunction, these sections simply provide that an officer or employee can be held personally liable for taxes owed, this liability does not terminate in the event that the taxpayer or operator is dissolved,

and no collection action can be commenced against the officer or employee more than three years after the conclusion of proceeding against the taxpayer or operator. Nothing in the plain language of these sections provide that liability must first be found against the operator or collector.

¶ 82 Sommerfeld further misconstrues the three year provision in section 3-4-270(B) of the URPO to mean that an officer or employee does not automatically become "personally liable" and "[t]hat only occurs when an assessment becomes final and is not paid." Instead, section 3-4-270(B) prohibits the City, in this case, from issuing an assessment or commencing an action against an employee or officer more than three years after the conclusion of all proceedings against the taxpayer or tax collector. The provision does not expressly state that an assessment against an employee or officer must be brought after action against the tax collector is fully litigated. Therefore, we reject Sommerfeld's argument that the URPO expressly prohibits the City from issuing him an assessment because the separate assessment issued to Mid-City was not fully litigated.

¶ 83 Citing *Department of Revenue v. Heartland Investments, Inc.*, 106 Ill. 2d 19 (1985), Sommerfeld argues that a RO liability is derivative in nature to Mid-City's action, and therefore, "there could be no finding that an assessment is either final or that there is any amount due and owing by Sommerfeld." In *Heartland*, the Department of Revenue initiated a collection suit seeking to hold corporate officers personally liable for unpaid taxes pursuant to the Retailers' Occupation Tax Act. *Id.* at 27-28. Our supreme court held that "[o]nly where the corporation has incurred retailers' occupation tax liability and is unable to pay such amounts to the Department may personal liability attach to a responsible officer or employee who has wilfully failed to file retailers' occupation tax returns or pay retailers' occupation taxes." *Id.* at

32. In doing so, the court looked specifically to "section 13½ of the [Retailers' Occupation Tax Act]," which stated that " '[a]ny officer or employee of any corporation *** who has the control, supervision or responsibility of filing returns and making payment of the amount of tax' " and who willfully fails to file such return or make payment " 'shall be personally liable for such amounts, *** in the event that after proper proceedings for the collection of such amounts, *** [the] corporation is unable to pay such amounts to the department.' " *Id.* at 27-28 (quoting Ill. Rev. Stat. 1979, ch. 120, ¶ 452½). *Heartland* is distinguishable from the present case. There, the Retailers' Occupation Tax Act specifically provided that an employee or officer is personally liable when the corporation is unable to pay after proper proceedings. In contrast, here, section 3-4-270 of the URPO does not contain such language, and we cannot read in any such condition. See *Riseborough*, 2014 IL 114271, ¶ 15 (providing that when the statutory language is clear and unambiguous, a court may not depart from the plain language by reading into the statute exceptions, limitations, or conditions).

¶ 84                                                  2. Notice

¶ 85        Alternatively, Sommerfeld contends that the ALO's decision should be affirmed because he was not afforded proper notice of the assessment against him. The ALO found that the City failed to effectuate proper service in that (1) the RO notice was sent via express mail rather than certified mail, (2) the RO notice was sent to Mid-City's business address rather than Sommerfeld's business address, (3) Sommerfeld's testimony that he did not receive the RO notice was unrebutted, and (4) the City's attempt at service did not comport with requirements for abode service as set forth by *MB Financial Bank, NA. v. Ted & Paul, LLC*, 2013 IL App (1st) 122077.

¶ 86         Under the URPO, the City must "serve written notice of any tax determination and assessment on the person to whom it is issued." Chicago Municipal Code § 3-4-160 (amended Nov. 8, 2012). The City may provide such notice by either "(1) first class, express or priority mail, registered or certified mail (with or without return receipt requested), or overnight carrier any of which shall be addressed to the person concerned at the person's last known address *** or (2) personal service." Chicago Municipal Code § 3-4-040(A) (amended Nov. 16, 2011). If the City chooses to provide service via mail, it must send the notice to "the person concerned" at his "last known address." *Id.* The URPO permits a taxpayer to challenge a financial assessment on the basis that he was not "afforded proper notice of the assessment before it became final." Chicago Municipal Code § 3-4-335(D) (amended Nov. 14, 2018).

¶ 87         Here, the evidence at the administrative hearing established that the City sent Sommerfeld a RO notice via express mail. Although the ALO found that the City was required to send notice by certified mail, as it did with respect to other notices, the plain language of the URPO provides that the RO notice could also be sent via express mail, with or without return receipt requested. See Chicago Municipal Code § 3-4-040(A) (amended Nov. 16, 2011). Additionally, there is no dispute that, as Sommerfeld was the RO of Mid-City, he is a "person concerned" within the meaning of the URPO. Although the RO notice misspelled Sommerfeld's last name as "Sommerfield," he testified that he knew the RO notice was for him. Thus, the ALO's decision was clearly erroneous to the extent it required the City to use certified mail and considered the misspelling of Sommerfeld's name.

¶ 88         As to the issue of whether the RO notice was sent to Sommerfeld at his "last known address," the ALO found that it was not. The ALO reasoned that the notice was mailed to Mid-City's business address and not to Sommerfeld's home address. Relying on *MB Financial*

*Bank, N.A.*, 2013 IL App (1st) 122077, the ALO found that the City's attempt at service was improper because it did not comport with the requirements for personal service. That case, however, did not involve sending notice at an individual's "last known address," as provided by the URPO, but instead involved various types of personal service pursuant to the Code of Civil Procedure. *Id.* ¶ 28.

¶ 89    Although *MB Financial Bank, N.A.*, did not cite specific sections of the Code of Civil Procedure, we note that section 2-203 generally governs personal service. 735 ILCS 5/2-203 (West 2012). Unlike section 2-203 of the Code of Civil Procedure, the URPO does not include strict guidelines as to service. For instance, the URPO takes a broad approach as to the method of mailing, providing that notice can be sent via "first class, express or priority mail, registered or certified mail (with or without return receipt requested), or overnight carrier." Chicago Municipal Code § 3-4-040(A) (amended Nov. 16, 2011). The URPO also does not require the notice to be mailed to a home address, nor does it make a distinction between home and business addresses. The URPO simply states that the notice must be sent to "the person concerned" at his "last known address." *Id.* As such, we find that the ALO erred in finding that the requirements of service as set forth in *MB Financial Bank, N.A.*, applied to service under the URPO.

¶ 90    We further note that the ALO cited *MB Financial Bank, N.A.*, for the proposition that "where the return of abode service is challenged by affidavit, and there is no counter-affidavit to address this challenge, the return of service itself is not enough evidence," and therefore, Sommerfeld's testimony is unrebutted and must be taken as true. *MB Financial Bank, N.A.*, 2013 IL App (1st) 122077, ¶ 26. However, this case is factually distinct from *MB Financial Bank, N.A.*, as notice was not delivered via abode service. As such, the ALO erred in finding

that Sommerfeld's testimony was unrebutted even though the City proffered a "track and confirm" receipt showing the notice was delivered. The validity of the service cannot be simply rebutted by Sommerfeld's assertion that he did not receive the notice. See *Thompson v. Department of Employment Security*, 399 Ill. App. 3d 393, 395 (2010) (providing that "[s]ervice by mail is not invalid simply because a party denies receiving it"). Thus, the City met its burden of proving that the notice was delivered.

¶ 91    Our analysis now turns to the issue of whether the City properly notified Sommerfeld of his tax liability by sending the notice to Mid-City's business address. In addressing this issue, we look to *Department of Revenue v. Navarroli*, 170 Ill. App. 3d 355 (1988), for guidance. There, the Department of Revenue sought to hold defendant RO personally liable for his company's tax liability pursuant to the Illinois Income Tax Act. *Id.* at 356. The Department of Revenue sent a notice of tax assessment, addressed to the defendant at the company's business address, which was listed on the tax returns. *Id.* at 356-57. The court held that the defendant was properly notified at his last known address. *Id. Navarroli* refutes the ALO's conclusion that service upon Sommerfeld was only proper if the notice was sent to Sommerfeld's listed home address. We find that the City properly notified Sommerfeld of the assessment by mailing the RO notice to Mid-City's business address, which he provided on the taxpayer information form. Additionally, it was not unreasonable to use Mid-City's business address, as the tax liability was assessed against Sommerfeld in his capacity as Mid-City's RO. Therefore, we find that notice was proper.

¶ 92    Having found that Sommerfeld was properly served, we need not address his argument that due process entitled him to service at home.

¶ 93                                    III. CONCLUSION

Nos. 1-18-0855 & 1-18-1677 cons.

¶ 94    For the reasons stated, with respect to the City's appeal, we reverse the decision of the circuit court of Cook County and affirm the ALO's decision. With respect to Sommerfeld's appeal, we affirm the decision of the circuit court of Cook County and reverse the decision of the ALO.

¶ 95    No. 1-18-1677, circuit court's judgment reversed, and ALO's decision affirmed.

¶ 96    No. 1-18-0855, circuit court's judgment affirmed, and ALO's decision reversed.

**No. 1-18-0855**

| | |
|---|---|
| **Cite as:** | *City of Chicago v. Sommerfeld*, 2020 IL App (1st) 180855 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 16-L-50158, 16-CH-04400; the Hon. James M. McGing and the Hon. Daniel J. Kubasiak, Judges, presiding. |
| **Attorneys for Appellant:** | Jeffrey D. Javors, of Chicago, for appellant William Sommerfeld. |
| **Attorneys for Appellee:** | Mark A. Flessner, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Julian N. Henriques Jr., Assistant Corporation Counsel, of counsel), for appellee City of Chicago. |