2025 IL App (1st) 240025

FOURTH DIVISION
Opinion filed: March 20, 2025

No. 1-24-0025

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| ALLY FINANCIAL, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 2021L050297 |
| CHICAGO DEPARTMENT OF ADMINISTRATIVE | ) | |
| HEARINGS and CHICAGO DEPARTMENT OF | ) | |
| FINANCE, | ) | Honorable |
| | ) | Jean M. Golden, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff, Ally Financial, Inc. (Ally), appeals from an order of the Circuit Court of

Cook County, affirming the final decision of an administrative law judge (ALJ) of the Chicago

Department of Administrative Hearings (DAH) which affirmed the Chicago Department of

Finance's (DOF) assessments of taxes, interest, and penalties against it for failure to remit

Chicago's lease transaction tax (lease tax) payments and titled personal property use tax (use tax)

payments.  For the reasons which follow, we affirm the circuit court in part, reverse the circuit

court in part, reverse the DAH's final decision in part, and remand the matter to the DAH with directions.

¶ 2   Although the conclusions to be drawn from the facts of this case are in dispute, the underlying facts are largely undisputed. Ally, formerly known as General Motors Acceptance Corporation (GMAC), is an automotive financing company that takes assignments of motor vehicle leases from independent automobile dealers operating both inside and outside of the City of Chicago (City) and purchases the vehicles being leased.  The lease transactions which are the subject to this appeal and the relationship of Ally to the dealers follow a similar pattern.

¶ 3   As a condition for availing itself of the lease financing services provided by Ally, an automobile dealer is required to enter into a Master Lease Agreement (MLA) with Ally, the provisions of which dictate and govern the terms under which Ally will finance vehicle lease transactions.  When a customer goes into a dealership that does business with Ally for the purpose of leasing a vehicle, the customer picks out the vehicle to be leased and negotiates the price of the vehicle with the dealer along with the term of the lease, as well as the amount of any required down payment which is referred to as capitalized cost reduction (CCR), which includes the value of any trade-in vehicle.  A credit application is then completed and forwarded electronically along with the terms of the transaction to a number of lease financing companies. When a financing company such as Ally receives the credit application and lease terms, it then decides whether to approve the application and agree to finance the lease. If more than one financing company agrees to finance a transaction, the dealer decides which financing company will fund the lease and purchase the vehicle. The dealer and customer then execute a lease agreement. If Ally is to finance the lease, Ally's MLA requires the dealer to use Ally's "SmartLease" form lease.  The lease sets

forth, among other items: the gross capitalization cost of the transaction which includes the agreed value of the vehicle, any administrative fees, license and registration fees, and any taxes which are due on the transaction; the monthly lease payments; the amount of the CCR; and the term of the lease. The form lease lists the dealer as the lessor and the customer as the lessee. When the lease is completed and executed, the dealer collects from the customer-lessee the CCR payment and the first month's rental payment due to Ally. The dealer executes an assignment of the lease to Ally and assigns all right, title and interest in the subject vehicle to Ally, both of which assignments are located on Ally's form lease. The dealer then forwards the lease to Ally. The dealer also completes any documentation required to transfer ownership of the vehicle to Ally, and Ally purchases the vehicle from the dealer.

¶ 4    The City imposes a lease tax on the lease or rental of personal property used in the City or the privilege of using personal property in the City that has been leased or rented outside the City. Chicago Municipal Code (Code) § 3-32-030A (amended Nov. 13, 2007). The tax imposed is a percentage of the "lease or rental price" of the property which is to be paid by the lessee at the time of each lease or rental payment. Chicago Municipal Code § 3-32-030B (amended Nov. 13, 2007). Although the duty to pay the tax is on the lessee of the property, section 3-32-080A of the Code obligates the lessor to remit the tax to the City. Chicago Municipal Code § 3-32-080A (amended Nov. 17, 1999).

¶ 5    The City also imposes a tax on the use of titled personal property in the City when that property is purchased at retail. Chicago Municipal Code § 3-28-030A (amended Dec. 15, 2004). The duty to pay that tax is on the purchaser of the property. *Id.* However, the Code places the duty

to collect the tax and remit it to the City on every retailer subject to the City tax enforcement. Chicago Municipal Code § 3-28-038A (added Nov. 10, 1994).

¶ 6 Following an audit of vehicle lease transactions in which either Ally or GMAC was the lessor by assignment from independent automobile dealers, the DOF issued a Notice of Tax Determination and Assessment to Ally on June 28, 2016, finding that for the period from July 1, 2009, to June 30, 2014, Ally failed to remit lease taxes allegedly owed to the City in violation of Chapter 3-32 of the Code (hereinafter, "2016 Lease Tax Notice"). The 2016 Lease Tax Notice assessed Ally $480,281.14 for unpaid lease taxes, $225,269.03 for interest, a late penalty of $27,205.33, and a willfulness penalty of $120,070.29, for a total assessment of $852,825.79.

¶ 7 On July 29, 2016, the DOF issued a separate Notice of Tax Determination and Assessment to Ally, finding that for the period from July 1, 2009, to June 30, 2014, Ally failed to pay and remit use taxes that it allegedly owed to the City in violation of Chapter 3-28 of the Code (hereinafter, "2016 Use Tax Notice"). The 2016 Use Tax Notice assessed Ally $118,874.48 for use taxes owed, $59,864.05 for interest, a late penalty of $5,943.67, and a willfulness penalty of $29,718.37, for a total assessment of $214,400.57.

¶ 8 On July 29, 2016, Ally filed a written protest and petition for a hearing before the DAH, challenging the 2016 Lease Tax Notice, and on September 1, 2016, it filed a separate written protest and petition, challenging the 2016 Use Tax Notice. The protests were consolidated into a single proceeding.

¶ 9 While the matter was pending and undetermined before the DAH, the DOF issued two amended Notice of Tax Determination and Assessments both of which made changes to the 2016 Lease Tax Notice. The 2018 amended Lease Tax Notice was issued on July 16, 2018, and the 2020

amended Lease Tax Notice was issued on August 7, 2020. The 2020 amended Lease Tax Notice alleged that Ally owed unpaid lease taxes of $953,843.01, interest of $906,475.51, a late penalty of $50,454.46, and a willfulness penalty of $238,460.75, for a total of $2,149,233.73. Ally filed an amended protest in response to each amended Lease Tax Notice, adding an argument that the amended Lease Tax Notices were issued outside the four-year limitations period set forth in section 3-4-120(A) of the Code (amended Nov. 16, 2011).

¶ 10    The matter proceeded to a three-day evidentiary hearing before one of the DAH's ALJs. Three witnesses testified at that hearing: Katina Drake Byansis (Drake), a City auditor; Jason Binando, an employee of Ally; and Cheryl Flynn, the president of Tax Lease Consultants and a former employee of Ally. Numerous exhibits were received in evidence, including Ally's MLA and form lease agreement. Following that hearing, the ALJ issued a "Final Decision" on May 28, 2021, affirming both the 2016 Use Tax Notice and the 2020 amended Lease Tax Notice. The ALJ found, *inter alia,* that (1) the 2020 amended Lease Tax Notice was timely as an amendment of the initial 2016 Lease Tax Notice issued before the running of the limitations period, (2) Ally was the "first lessor" in the subject transactions and "[had] the obligation and responsibility to collect and remit the lease tax due for the payments that are made to the dealers at the time of lease signing," (3) any purchaser of personal property to be used in Chicago is subject to the payment of use tax with no geographic limitations on the location of the purchase, and 4) Ally failed to meet its burden of proving that the DOF's 2016 Use Tax Notice was incorrect. The ALJ affirmed the assessment of a total of $2,149,233.73 in tax, interest, and penalties resulting from the 2020 amended Lease Tax Notice and $214,399.57 in tax, interest, and penalties resulting from the 2016 Use Tax Notice.

¶ 11    On July 2, 2021, Ally filed a complaint for administrative review in the Circuit Court of Cook County, seeking review of the DAH's final decision as set forth in the ALJ's written decision. Ally argued that (1) the dealers were responsible for remitting the lease tax on the CCR payments they received, (2) it was not liable for use taxes that were assessed, (3) the statute of limitations expired before the 2020 amended Lease Tax Notice was issued, and (4) audit errors by the City resulted in the assessments being "overstated" and those errors overcame any presumption of their validity. On December 15, 2023, the circuit court issued a written order, finding that the ALJ made no errors of law and that his decision was not against the manifest weight of the evidence.  The circuit court affirmed the ALJ's decision, and this appeal followed.

¶ 12    In urging reversal, Ally argues that: (1) it was not responsible for the collection or remittance of the lease taxes on the CCR payments collected by independent vehicle dealers; (2) the 2018 and 2020 amended Lease Tax Notices were time barred, having been issued by the DOF after the limitations period expired; (3) prorated lease taxes on the CCR payments are not due on transactions in which the dealer and the customer were located outside of the City when the lease was signed; and (4) it was not responsible for paying a prorated portion of use tax on vehicles that were registered to locations outside of Chicago when purchased, notwithstanding their subsequent registration at a location within the City.

¶ 13    When, as in this case, an appeal is taken following the entry of a judgment by the circuit court on administrative review, it is the decision of the administrative agency, not the judgment of the circuit court, which we review. *Mireles v. Dart*, 2023 IL App (1st) 221090, ¶ 54; *Chak Fai Hau v. Department of Revenue*, 2019 IL App (1st) 172588, ¶ 32.  Judicial review of a final decision of the DAH is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (2020)).

Chicago Municipal Code, § 2-14-102 (added Apr. 29, 1998). Section 3-110 of the Administrative Review Law provides that an administrative agency's findings of fact are deemed "prima facia true and correct." 735 ILCS 5/3-110 (2020). We will disturb an administrative agency's factual findings only if they are against the manifest weight of the evidence. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). An administrative agency's factual determinations are against the manifest weight of the evidence where an opposite conclusion is clearly apparent. *Mireles,* 2023 IL App (1st) 221090, ¶ 56. Whether a reviewing court might reach the same conclusion is not the test of whether the agency's determination on a question of fact is supported by the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the agency's determination. See *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982).

¶ 14 We apply a *de novo* standard of review to pure questions of law. *Anderson*, 348 Ill. App. 3d at 560. However, where "the case involves an examination of the legal effect of a given set of facts, it involves a mixed question of law and fact, and the administrative agency's decision will be affirmed unless clearly erroneous." *Id.* An administrative agency's decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel,* 216 Ill. 2d 569, 577-78 (2005).

¶ 15 We first address Ally's argument that the 2020 amended Lease Tax Notice was untimely because it was issued after the expiration of the four-year limitations period set forth in section 3-4-120(A) of the Code. Section 3-4-120(A) of the Code provides that "the comptroller shall not issue any notice of tax determination and assessment to a taxpayer or tax collector for any period more than four years after the end of the calendar year in which the return for the period was filed

with the department." *Id.* The facts relevant to the question of whether the 2020 amended Lease Tax Notice was time barred are not in dispute.

¶ 16    As we noted earlier, the DOF issued a Notice of Tax Determination and Assessment on June 28, 2016, following an audit, finding that for the period from July 1, 2009, to June 30, 2014, Ally failed to remit lease taxes owed. Ally had executed a waiver of the limitations period, permitting the DOF to issue an assessment on or before December 31, 2016. On July 29, 2016, Ally filed a written protest and petition for hearing, challenging the 2016 Lease Tax Notice. While the matter was pending before the DAH, the DOF filed two amended Notices of Tax Determination and Assessment both of which made changes to the 2016 Lease Tax Notice. The 2018 amended Lease Tax Notice was issued on July 16, 2018, and the 2020 amended Lease Tax Notice was issued on August 7, 2020. The ALJ found, and we agree, that the 2020 amended Lease Tax Notice was not time barred.

¶ 17    As the City correctly asserts, section 3-4-150(B) of the Code provides that the comptroller "may amend a tax determination and assessment at any time before it is final." Chicago Municipal Code § 3-4-150(B) (amended Nov. 16, 2011). If, as in this case, the taxpayer contests an assessment, the assessment only becomes final after the conclusion of a hearing before the DAH when "the administrative law officer *** issue[s] a final assessment." Chicago Municipal Code § 3-4-340(H)(2) (amended Nov. 16, 2011). The timely filed 2016 Lease Tax Notice in this case was the subject of an unresolved protest filed by Ally when the 2020 amended Lease Tax Notice was issued. As a consequence, the 2016 Lease Tax Notice was not final when amended on August 7, 2020. We conclude, therefore, that the 2020 amended Lease Tax Notice related back to the timely filed 2016 Lease Tax Notice.

¶ 18 In urging reversal of the ALJ's affirmance of the 2020 amended Lease Tax Notice, Ally argues that it was not the lessor of the subject vehicles when the lessees made CCR payments to the dealers. Ally asserts that it is undisputed that the CCR payments were made to the dealers. It reasons, therefore, that because it was not the lessor of the subject vehicles at the time that the lessees paid the CCR payments to the dealers, it was not required to collect or remit lease taxes on the CCR payments.

¶ 19 Addressing the question of whether Ally was liable for the payment of lease taxes on the CCR payments received by the dealers, the ALJ's decision states that the "primary issue in dispute is whether Ally or the dealer is the lessor at the time the CCR payment is made by the customer to the dealer." In resolving the question and affirming the 2020 amended Lease Tax Notice, the ALJ made a number of factual findings with which Ally takes issue.

¶ 20 The ALJ found that, once Ally approved the transaction and the dealer chose Ally to finance the lease transaction, the MLA between the dealer and Ally required that Ally's lease form be used for the transaction. That single document contained the lease, the dealer's assignment of the lease to Ally, and the dealer's assignment to Ally of all right title and interest in the subject vehicle. According to the ALJ, "the Ally Financial Master Retail-Lease Agreement [MLA], and all of the additional incorporated documents, read in its entirety, is clearly a one-sided agreement that demonstrates Ally Financial has complete control over the lease transactions, and that the dealer acts on Ally's behalf to effectuate the assignment of the lease and the sale of the vehicle to Ally." The ALJ found that in each transaction "[t]he lease, the assignment, and the transfer of the vehicle all take place with one document, one transaction, and at the same time on the same day." The ALJ concluded that, once a dealer chooses Ally as the financing company, it is Ally that

controls the entire lease transaction and the dealer "arguably" acts on behalf of Ally "to close the deal, assign the lease to Ally, and sell the vehicle to Ally." The ALJ determined that "[n]otwithstanding the language of Ally's lease agreement and Section 6 of the Master Agreement [MLA] between Ally and the dealers that disclaims any principal agent relationship, there is ample evidence to conclude the dealers were acting as Ally's agent to accept assignment on its behalf." The ALJ also noted that there is nothing in the language of the assignment of the lease to Ally suggesting that the assignment was contingent on a later review and approval by Ally. The ALJ observed that the dealer completes Ally's form lease agreement, calculates the payments to be made under the lease, includes Ally's administrative fee on the lease agreement, and accepts the CCR payment and the first monthly payment due to Ally from the lessee. The dealer also completes all documentation necessary to transfer the subject vehicle to Ally. The ALJ found that Ally's form lease and related documents "is just one example that demonstrates that there is ample evidence to support a finding that that the assignment of the lease occurred contemporaneously with their execution and the dealers were acting as Ally's agents for these transactions." Specifically, the ALJ found that "the dealers were acting as Ally's agent at the time the leases were signed." The ALJ's decision states that he found "the evidence compelling that Ally is the first lessor in these 2700 lease transactions at issue in this matter, and as such, has the obligation and responsibility to collect and remit the lease tax due for the CCR payments that are made to the dealers at the time of lease signing."

¶ 21      In support of its argument that it was not required to remit lease taxes on CCR payments made to the dealers, Ally notes that the dealers executed the assignments as the assignor and were, therefore, the lessors at the time that the CCR payments were made. It asserts that for a valid

assignment to occur, the assignee acquires all of the interest of the assignor in the property that is transferred. *Northwest Diversified, Inc. v. Desai,* 353 Ill. App. 3d 378, 387 (2004). Ally concludes, therefore, that there could not have been two lessors at the time the leases were signed and later assigned and it could not have been the "first lessor" as the ALJ found. Ally also notes that the signature blocks on the leases identify only the dealer as the lessor. Ally also asserts that there can be no effective assignment absent assent by the assignee. *Season Comfort Corp. v. Ben A. Borenstein Co.* 281 Ill. App. 3d 648, 653 (1995); *Restatement (Second) of Contracts* § 327(1) (1981). It contends that the MLA which is incorporated into every lease gives it "discretion to accept or reject any lease for any reason." Ally argues that its acceptance of the assignments of the subject leases did not occur until after the lease was transmitted to it and the transaction was "booked" into its system, not simultaneously with the execution of the lease as the ALJ found. According to Ally, the ALJ's reasoning was "wrong as a matter of law." It argues that there is nothing in the Code that imposes an obligation on "assignees that do not themselves actually receive the taxable lease payment" to collect or remit lease taxes on the payment. See Chicago Municipal Code § 3-32-080A(1). Ally reasons that, because it was not the lessor or the assignee of the lessor-dealers at the time that the CCR payments were made to the dealers, it had no obligation to remit lease taxes on the CCR payments. It concludes, therefore, that the ALJ erred in affirming the 2020 amended Lease Tax Notice.

¶ 22    In response, the City argues that there is ample evidence in the record to support the ALJ's finding that the execution of the leases and their assignments occurred simultaneously, and because each lease was assigned to Ally at the moment that it was signed, Ally was "a lessor at lease origination" and liable for the remittance of lease taxes on the CCR payment made by the

customer-lessees. The City asserts that an assignment occurs when the assignor transfers some identifiable interest in property to the assignee. *Cincinnati Insurance Co. v. American Hardware Manufactures Association,* 387 Ill. App. 3d 85, 100 (2008). The City concedes that a valid assignment requires assent by the assignee, but argues that, by drafting the form lease which contains the assignment language and requiring that the form lease be used in every transaction to be financed by it, Ally manifested its assent to the assignments. The City also argues that, because Ally controlled every aspect of the transaction after it was selected as the financing company, the dealer was acting as Ally's agent at the time that the lease was signed. Referencing the terms of the MLA, which provide that the dealers were required to "forward to Ally any payment on any Contract or Lease purchased by Ally received by Dealer along with any necessary endorsements," the City argues that Ally is required to remit lease taxes on both the CCR and the first monthly payment due Ally because the dealer collected both payments from the customer-lessee at the time that the lease was signed. The City contends that Ally receives the CCR payments from the dealers in the form of a credit against the purchase price that Ally pays the dealer for the vehicle being leased.

¶ 23    We have examined the testimony and exhibits received in evidence at the hearing before the ALJ and conclude that the following facts found by the ALJ are supported by the record. Once Ally is selected by the dealer as the entity that will finance a lease, Ally controls the entire transaction. Ally's form lease must be used for the transaction which contains the lease itself, the dealer's assignment of the lease to Ally, and the dealer's assignment to Ally of all right title and interest in the subject vehicle. As Binando testified, no other document is used to effectuate the assignments. Both the lease and the assignments are executed at the same time on the same day. The dealer collects both the CCR payment and the first monthly payment due Ally from the

customer-lessee at the time that the lease is signed. As the foregoing findings are supported by evidence in the record, the ALJ's findings as to those matters are not against the manifest weight of the evidence. We do, however, reject certain conclusions reached by the ALJ, and the City based on those facts.

¶ 24    The ALJ's decision in this case is capable of two interpretations of the agency relationship that he found existed between the dealers and Ally. One portion of the decision finds that the dealers were acting as Ally's agent "to accept assignment on its behalf."

¶ 25    If, as the ALJ found, the dealers acted as Ally's agent to accept the assignment of the leases, then it was the dealers who were the "first lessor", and not Ally as the ALJ found. "An assignment occurs when 'there is a transfer of some identifiable interest from the assignor to the assignee'" *Cincinnati Insurance Co.*, 387 Ill. App. 3d at 100 (quoting *Brandon Apparel Group v. Kirkland & Ellis*, 382 Ill. App. 3d 273, 283 (2008)). It follows, therefore, that, when the dealers assigned the leases to Ally, they had an identifiable interest in the leases which they assigned. Having such an identifiable interest at the time of the assignment, the dealers were the "first lessors" if even for an instant. We conclude that under this interpretation the ALJ's finding that Ally was the first lessor is against the manifest weight of the evidence as an opposite conclusion is clearly apparent.

¶ 26    If, as the ALJ apparently found, and the City argues, the dealers acted as Ally's agent in the execution of the leases themselves, then it was Ally as the principal that was the "first lessor," and there could have been no effective assignment of the leases as an entity possessed of an identifiable interest in property cannot assign that same interest to itself. Any finding that the dealers acted both as Ally's agent in the execution of the leases and the assignor of those same leases to Ally is internally inconsistent and, therefore, against the manifest weight of the evidence.

¶ 27    Although we have found that the ALJ's findings that Ally was the "first lessor" and that the dealers acted as Ally's agent in the execution of the subject leases are both against the manifest weight of the evidence, our analysis of the issue of whether Ally was obligated to remit lease taxes on the CCR payments received by the dealers continues.  We will affirm a decision of an administrative agency if there is any basis in the record to do so, regardless of whether the agency's reasoning is correct or sound.  *Freeman United Coal Mining Co. v. Industrial Comm'n*, 283 Ill. App. 3d 785, 793 (1996).

¶ 28    As we have found, the evidence of record supports the following factual findings of the ALJ.   Once Ally is selected by the dealer as the entity that will finance a lease, Ally controls the entire transaction.   The MLA entered into between Ally and the dealers requires the use of Ally's form lease.  Together the form lease and the MLA govern the obligations of both the dealer and the lessee. There is no question that, other than the agreed upon value of the vehicle being leased, the term of the lease, and value of any trade-in vehicle, all of which are negotiated between the customer and the dealer, Ally dictates all of the terms of the leases that it funds.  Both the lease and the assignments are executed at the same time on the same day. The dealer collects both the CCR payment and the first monthly payment due to Ally from the customer-lessee at the time that the lease is signed.  The printed portion of Ally's form lease also includes Ally's administrative fee as part of the gross capitalized costs of the transaction.  The CCR payment made by the customer-lessee is deducted from the gross capitalized cost in arriving at the adjusted capitalized cost of the transaction. Both the first monthly payment and Ally's administrative fee are deducted from the adjusted capitalized cost in determining the amount due to the dealer from Ally for its purchase of the vehicle.  When questioned by the ALJ, Binando admitted that, although the CCR

payment made by the lessee is kept by the dealer, the CCR payment is credited to Ally in calculating the price that Ally pays the dealer for the subject vehicle. It is undisputed that Ally remitted lease taxes to the City on the first monthly payments paid by the lessees to the dealers. As the City correctly notes, Binando testified that "the reason that Ally pays the [lease tax] on that first [monthly lease] payment is because that's something that [Ally] actually get[s] passed [to] us from the dealership even though [the dealer] collected it from the customer." The City argues that the same logic "applies equally to the CCR payment." Ally takes the position that the credit that it received for the CCR payments does not constitute a lease payment because "[t]he actual money was paid to the dealers, and under the ordinance they [the dealers], only, were required to remit the tax on it."

¶ 29 The facts relevant to the disposition of this issue are not seriously in dispute. It is the legal effect of those facts that we are tasked with deciding which involves a mixed question of law and fact. Consequently, we apply the clearly erroneous standard of review to the ALJ's ultimate conclusion on this issue. We interpret municipal ordinances *de novo*, using the general rules of statutory interpretation and construction. *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 847-850 (2007). The "fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 460 (2006). The best indicator of the legislature's intent is the "language of the statute, which is to be given its plain and ordinary meaning." *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). In determining the plain meaning of statutory terms, we "consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it." *Id.* When, as in this case, the language of an ordinance is clear and unambiguous, we may not depart from its plain

meaning. *City of Chicago Through Department of Finance v. Sommerfeld*, 2020 IL App (1st) 180855, ¶ 50; *Express Valet, Inc.,* 373 Ill. App. 3d at 850.

¶ 30    Section 3-32-020M of the Code defines a lessor as "any person [which includes corporations (see Chicago Municipal Code § 3-32-020P (amended Feb. 8, 2006))], including the assignee of any lease or rental agreement, who leases or rents personal property to users or who, directly or through an agreement or arrangement with another party, collects the consideration for the lease or rental of personal property."  Chicago Municipal Code § 3-32-020M (amended Feb. 8, 2006).  Section 3-32-030A of the Code imposes a tax upon "(1) the lease or rental in the city of personal property, or (2) the privilege of using in the city personal property that is leased or rented outside of the city."  Although the Code places the obligation to pay the tax on the lessee of the personal property (*Id.*), section 3-32-080A provides, in relevant part, that "every lessor shall remit to the department the tax attributable to lease or rental payments received during the immediately preceding calendar month."

¶ 31    The clear and unambiguous language of section 3-32-030A of the Code places the obligation to pay the lease taxes owed on the lessee of the personal property, and the clear and unambiguous language of section 3-32-080A of the Code places an obligation upon the lessor of the personal property to remit to the City the lease tax attributable to the lease or rental payments received during the immediately preceding calendar month.

¶ 32    There is no dispute, and Ally has made no contrary argument, that CCR payments are subject to the City's lease tax and that the lessor is obligated to remit to the City the lease tax attributable to the lease or rental payments received by it in the immediately preceding calendar month.  Ally's argument that it was not obligated to collect or remit lease tax on CCR payments

made to a dealer is premised on its assertion that it was not a lessor within the meaning of that term at the time that the CCR payments were made.

¶ 33    Although the dealers collected the CCR payments from the customer-lessees, that payment was passed on to Ally in the form of a credit against the purchase price of the vehicle just as in the case of Ally's administrative fee and its first month's lease payment, both of which were also paid to the dealers by the lessees.  However, Ally appears to argue that it was the dealers that received the CCR payments that were responsible for remitting the lease taxes owed on the payments to the City.  In response, the City cites to Binando's testimony where he stated that "the reason that Ally pays the [lease tax] on that first [monthly lease] payment is because that's something that [Ally] actually get[s] passed [to] us from the dealership even though [the dealer] collected it from the customer."  Binando explained that the first lease payment collected from the lessee is "deducted from the [purchase price] that [Ally pays] to the dealer."  The City argues that the same logic for Ally's payment of lease tax on the first monthly lease payment paid to the dealer and credited to Ally against the purchase price of the vehicle "apples equally to the CCR payment."  We agree with the City.

¶ 34    The lease tax is computed by multiplying the lease price by the tax rate. Chicago Municipal Code. § 3-32-030B (amended Nov. 13, 2007).  The Code defines "lease price" as "the consideration for the lease or rental of personal property, valued in money, whether received in money or otherwise, including cash, credits, property and services, determined without any deduction for costs or expenses whatever." Chicago Municipal Code § 3-32-020K (amended Feb. 8, 2006).  Notwithstanding its assertion that it was not the lessor by assignment until it accepted the assignment of the leases, Ally was clearly the lessor by assignment of the subject leases when

it received the CCR in the form of a credit against the purchase price that Ally paid the dealers of the subject vehicles. The amount of the CCR payments paid by the customer-lessees to the dealers, which was received by Ally as a credit against the price Ally paid the dealers for the subject vehicles, was a portion of the lease price. Functionally it is no different than the first monthly lease payments which were also received by the dealers and credited against the amount due for the purchase of the vehicles. As stated earlier, the MLA provides that the "[d]ealer shall forward to Ally any payment on any Contract or Lease purchased by Ally received by the Dealer, along with any necessary endorsements." The dealers satisfied that requirement by granting Ally a credit against the price of the vehicles Ally purchased. There is no evidence in the record that the dealers retained any portion of the CCR as a lease payment for the time that they spent as lessors before assigning the leases to Ally; rather, they granted Ally a credit for the entire CCR. When Ally received the CCR as a credit against the price of the vehicles, it received payment of a portion of the lease payments due. As such, it was required to remit the lease tax due on the CCR credits that it received. Based upon this analysis, we conclude that the ALJ's determination that Ally was obligated to remit lease taxes on the CCR payments subject to lease tax that it received as a credit on the purchase of the subject vehicles is not clearly erroneous.

¶ 35   Ally next argues that the DOF improperly assessed prorated lease taxes on the CCR payments for vehicles that were leased from a dealer located outside of the City and registered by the lessee to a location outside of the City but which were subsequently moved into the City during the lease term. The parties refer to these leased vehicles as Move-Ins.

¶ 36   Drake testified that she calculated the lease tax owed by Ally on the CCR payments for leases involving Move-In vehicles proportionately based on the number of days the vehicle was

based in Chicago divided by the total length of the lease. The ALJ found that "Ally is responsible for collection and remittance of the lease tax to the City, including a percentage of the tax due on CCR payments once the vehicle is moved into the City."

¶ 37    Ally argues that nothing in the lease tax ordinance provides for the taxing of lease payments, including CCR payments, on a prorated basis if no lease tax was due at the time that the payment was made. It asserts, the fact that "neither the City nor the ALJ can point to anything in the ordinance *allowing* pro-rating Move-In leases means that it is not allowed." (Emphasis in original.) Underlying the argument appears to be the premise that, if no lease tax is due on a lease payment, including a CCR payment, when made, then no lease tax is ever due on the payment and the lessor is, therefore, not liable for failing to remit lease tax on the payment.

¶ 38    The City correctly asserts that its lease tax ordinance applies to leases for vehicles leased from a dealer outside of the City and used in the City. It argues that the lease tax applies to "each" lease payment, including the CCR payment, and that the CCR payment is part of the "lease price" subject to taxation under the Code. The City also asserts that lease taxes are not due until liability is incurred, which does not occur until the property is used in Chicago. It reasons that, because CCR payments reduce the payment amounts that a lessee would otherwise pay during the months after a Move-In vehicle is used in the City, the portion of the CCR payment that is taxable depends on the number of months that the vehicle is used in the City. The City also argues that the DOF has authority to adopt and enforce rules concerning the administration of the City' s tax ordinances (Chicago Municipal Code § 3-4-150(A)(1) (amended May 24, 2006)), and its Information Bulletin states that CCR payments are considered as part of the lease price and taxable based on the percentage of time that the leased vehicle is used in the City. However, the issue is not whether

lease taxes are due on that portion of the CCR which is attributable to the time that a vehicle is used in the City. Rather, the issue is whether Ally was obligated to remit prorated lease taxes on the CCR payments on Move-In vehicles.

¶ 39    A determination of whether Ally was required to remit taxes on the CCR payments it received on Move-In vehicles by means of a credit against the sums due the dealers for the vehicles that it purchased requires a review of the City's lease tax scheme.

¶ 40    As noted earlier, section 3-32-030A of the Code imposes a lease tax on the lease in the City of personal property such as a motor vehicle or the privilege of using personal property in the City that is leased outside of the City. The incidence of that tax and the obligation to pay the tax is upon the lessee of the property. Section 3-32-030B of the Code fixes the amount of the tax as a percentage of the lease price of the property. The lease price of the property is defined as the consideration for the lease of the personal property valued in money, whether received in money which includes cash, credits, property and services. Chicago Municipal Code § 3-32-020K (amended Feb. 8, 2006). It is undisputed that CCR payments are part of the consideration for the vehicle leases assigned to Ally. However, section 3-32-030D of the Code provides that there is no lease tax due for any lease payment period in which property which was leased outside of the City is used solely outside of the City. Chicago Municipal Code § 3-32-030D (amended Nov. 13, 2007). Lease payment period is defined as the length of time or period of use that is covered by a single lease payment as agreed under the terms of the lease agreement. Chicago Municipal Code § 3-32-020K (amended Feb. 8, 2006). A CCR payment is a single payment that covers the entire length of the lease. Section 3-32-030B of the Code requires the lessee to pay lease taxes at the time of each lease payment. In the case of a Move-In vehicle, there is no lease tax due when the CCR is

paid. It is not until the vehicle is used in the City that the obligation to pay lease taxes is triggered. Section 3-32-080 of the Code provides, in relevant part, that the lessor of personal property such as Ally is obligated to remit lease taxes to the City which are "attributable to lease *** payments *received during the immediately preceding calendar month."* (Emphasis added.)

¶ 41 Based on the clear and unambiguous language of the provisions of the City's lease tax ordinance, CCR payments are part of the purchase price of the leases for Move-In vehicles which were assigned to Ally. CCR payments on Move-In vehicles constitute single payments covering the entire term of the leases. It was not until the Move-In vehicles were used in the City that the obligation to pay lease taxes arose. Ally was only obligated to remit lease taxes attributable to payments received by it during the immediately preceding calendar month. If no lease taxes were attributable to CCR payments on Move-In leases entered into during the calendar month in which those payments were made, Ally was not obligated to remit taxes on those payments. Nothing in the Code authorized the City to require a lessor such as Ally to remit, on a prorated basis, lease taxes on CCR payments that were not subject to lease taxes in the calendar month in which those payments were made.

¶ 42 Taxing statutes and ordinances are to be strictly construed and their language may not be extended or enlarged by implication beyond its clear import. In the case of doubt, they are to be construed against the government and in favor of the taxpayer. *Van's Material Co. v. Department of Revenue,* 131 Ill. 2d 196, 202 (1989). We cannot rewrite a statute or ordinance under the guise of statutory construction or depart from its plain meaning by reading into it conditions not expressed therein. *In re Michelle J.,* 209 Ill. 2d 428, 437 (2004). We must interpret statutes and ordinances as written and may not supply omissions, annex new provisions, or otherwise change

the enactment so as to depart from its plain meaning. *Spear v. Board of Education of North Shore School District No. 112,* 291 Ill. App. 3d 117, 119-20 (1997).

¶ 43    An administrative agency such as the DOF possesses no inherent powers.  Its authority to adopt rules and regulations is defined by the statute or ordinance creating that authority, and such rules and regulations must be in accord with the standards and policies set forth in the statute or ordinance. *Illinois Department of Revenue v. Illinois Civil Service Comm'n,* 357 Ill. App. 3d 352, 363-64 (2005).  "If an agency promulgates rules that are beyond the scope of the legislative grant of authority or that conflict with the statute, the rules are invalid." *Id.*

¶ 44    In this case, the clear and unambiguous language of the City's lease tax ordinance does not provide for lessors to remit prorated lease taxes on payments such as CCR payments made on leases of Move-In vehicles before lease taxes were due.  It follows, therefore, that Ally was not required to remit lease taxes on a prorated basis for CCR payments made before lease taxes were due on those payments.  Neither we under the guise of construction nor the DOF under the guise of rule making can engraft upon the City's lease tax ordinances an obligation on the part of lessors to remit lease taxes, on a prorated basis, for lease payments made when no lease tax was due such as in the case of CCR payments made on leases for Move-In vehicles.  We find, therefore, that the portion of the ALJ's decision affirming the 2020 amended Lease Tax Notice as it relates to taxes, interest and penalties for CCR payments made on leases for Move-In vehicles is clearly erroneous and must be reversed.

¶ 45    For its final issue on appeal, Ally argues that the ALJ erroneously found that it owed use taxes for its purchase of vehicles that were registered to lessees outside of the City at the time that the leases for those vehicles were executed but which on some later date were registered in the

City. Ally asserts that use taxes are assessed at the time that a vehicle is purchased and only if the vehicle is registered to an address in the City. It concludes that, if no use tax is due at the time a vehicle is purchased because it is registered at an address outside of the City, no use tax is due even after the vehicle's subsequent registration and use in the City.

¶ 46 When testifying, Drake identified a copy of the 2016 Use Tax Notice. She explained that Ally was assessed the use tax "[b]ecause they own the vehicle that they lease to be used in Chicago during the audit period." She identified part of the 2016 Use Tax Notice that set forth the calculation of the use taxes owed by Ally for Move-In vehicles. She explained that "move-ins" were leases originating outside of Chicago where the vehicle was moved into Chicago during the lease term. She calculated the use tax due for "move-ins" by assessing a tax on the purchase price proportionally based on the time the vehicle was used in the City.

¶ 47 The ALJ found that the Code imposes a use tax on the purchase of titled personal property used in the City with no geographical limitations based on the location of the purchase or restrictions on when the tax can be imposed. Based upon his interpretation of the Code as it relates to use taxes, the ALJ affirmed the 2016 Use Tax Notice.

¶ 48 In support of the ALJ's affirmance of the 2016 Use Tax Notice, the City asserts that its use tax is imposed on the "use" of property in the City, rather than on the "purchase" of the property. It argues that liability for payment of the tax is triggered when a vehicle that was purchased at retail from a retailer is registered in the City even if the vehicle was purchased outside of the City and regardless of when the vehicle was purchased.

¶ 49 Again, we are faced with an issue involving the interpretation of the Code. Section 3-28-030A of the Code imposes a use tax "upon the privilege of using in the city titled personal property

that is purchased at retail from a retailer." Titled personal property is tangible personal property, such as a motor vehicle, which is titled or registered with an agency of the State of Illinois at a location within the City. Chicago Municipal Code § 3-28-020A(7) (added Nov. 10, 1994). Section 3-28-030A places the ultimate obligation for payment of the tax on the purchaser of the property. The amount of tax owed is a percentage of the selling price of the personal property, as the term "selling price" is defined in the Illinois Use Tax Act. Chicago Municipal Code § 3-28-030B (amended Dec. 15, 2004). The Illinois Use Tax Act defines "selling price," in relevant part, as "the consideration for a sale valued in money whether received in money or otherwise, including cash, [or] credits *** not including the value of or credit given for traded-in tangible personal property where the item that is traded-in is of like kind and character as that which is being sold ***." 354 ILCS 105/2 (West 2016). If the personal property subject to use tax is sold by a retailer subject to the City's tax enforcement, it is the retailer's duty to collect the tax from the purchaser and remit it to the City. Chicago Municipal Code § 3-28-038A (added Nov. 10, 1994). Although the ultimate obligation for payment of the tax is on the purchaser of the property, if a retailer subject to the City's tax enforcement fails to collect and remit the tax, the retailer is liable to the City for the amount of the tax. *Id.*

¶ 50    It is undisputed that Ally purchased the vehicles which were the subject of its leases from the dealers who had assigned the vehicles' leases to it. Ally makes no argument that the dealers from whom it purchased the vehicles were not retailers as that term is defined in section 3-28-020A(5) of the Code (added Nov. 10, 1994). If a leased vehicle was registered to a location outside of the City at the time that Ally purchased the vehicle, no use tax was then due. If, however, that vehicle was subsequently moved and registered with the State of Illinois to a location in the City,

it is the City's contention, and the ALJ's finding, that use tax was then owed to the City by Ally as the purchaser. We agree.

¶ 51 Ally argues that "[t]he retail purchase of a vehicle triggers Use Tax liability only if it is registered at an address in the City." It is not, however, the purchase of a vehicle that triggers use tax liability, it is the vehicle's use in the City that triggers use tax liability. The City's use tax is not a sales tax. That is to say, it is not a tax on the purchase of personal property. Rather, by the plain language of section 3-28-030A of the Code, the City's use tax is a tax on "the privilege of using in the city titled personal property that is purchased at retail from a retailer." Had the City wished to limit liability for use taxes to circumstances where the titled personal property was registered to a location in the City at the time of purchase it could have done so, but it did not. And we are not at liberty under the guise of interpretation to engraft such a restriction on the ordinance. We reject Ally's argument that it is not liable for use taxes on vehicles that were registered at a location outside the City when purchased but subsequently registered to an address within the City at some subsequent date.

¶ 52 Other than its argument that it was not liable for the payment of use tax on Move-In vehicles, Ally has raised no argument addressed to the City's computation of the use taxes owed. As a consequence we find no error in the ALJ's affirmance of the 2016 Use Tax Notice.

¶ 53 Based on the foregoing analysis, we: 1) reverse that portion of the circuit court's order affirming the portion of the ALJ's final decision which found Ally liable for prorated lease taxes due on Move-In vehicles; 2) affirm the circuit court's order in all other respects; 3) reverse that portion of the ALJ's final decision which found Ally liable for prorated lease taxes due on Move-

In vehicles; and remand this matter to the DAH for recalculation of the lease taxes, interest and penalties owed by Ally consistent with our holdings expressed herein.

¶ 54    Circuit court affirmed in part and reversed in part.

¶ 55    Agency decision reversed in part and remanded to the agency with directions.

Ally Financial, Inc. v. Chicago Department of Administrative Hearings
2025 IL App (1st) 240025

_____

Appeal from the Circuit Court of Cook County,
No. 2021L050297, Honorable Jean M. Golden Judge Presiding

_____

| | |
|---|---|
| Appellant's Attorneys: | Mark S. Bernstein |
| | Joel D. Bertocchi Eric J. Gribbin |
| | Akerman LLP |
| | 71 S. Wacker Drive, 47th Floor |
| | Chicago, IL  60606 |
| | Phone:  (312) 634-5700 |
| | |
| Appellees' Attorneys: | Mary B. Richardson-Lowry, Corporation Counsel of the City of Chicago; Myriam Zreczny Kasper, Deputy Corporation Counsel; Suzanne Loose, Chief Assistant Corporation Counsel; Stephen Collins, Assistant Corporation Counsel Supervisor; Alexandra Weiss, Assistant Corporation Counsel |
| | 2 North LaSalle Street, Suite 580 |
| | Chicago, IL 60602 |
| | Phone: (312) 744-0468 |